IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :

                          :        1:22-CR-116-1 (CJN)

          v.              :

                          :

DAVID JOSEPH GIETZEN,    :

                          :

       Defendant.     :

## DEFENDANT'S MOTION TO DISMISS

David Joseph Gietzen, through undersigned counsel, respectfully moves to dismiss Counts One, Five, Six, and Seven of the Indictment, pursuant to Fed. R. Crim. P. 12(b). For the reasons discussed below, these counts fail to state an offense and fail to give proper notice to the defendant.[1]

## Background

On April 1, 2022, Mr. Gietzen was charged, *inter alia,* with alleged violations of 18 U.S.C. §§231(a)(3) and (2), Civil Disorder and Aiding and Abetting; and 18 U.S.C. §1752(a)(1), (2) and (4), Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon. *See* Doc. 5. This matter is currently

---

[1] Mr. Gietzen, through counsel, acknowledges that Courts in this jurisdiction have denied similar motions to dismiss, and does not anticipate a need for the motions herein to be orally argued. *See United States v. Griffin*, 549 F. Supp. 3d 49 (D.D.C. 2021); *United States v. Sandlin*, 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh*, 2022 WL 296304 (D.D.C. Feb. 1, 2022); *United States v. Andries*, 2022 WL 768684 (D.D.C. Mar. 14, 2022); *United States v. Puma*, 2022 WL 823079; *United States v. Bingert*, 2022 WL 1659163 (D.D.C. May 25, 2022); *United States v. Antony Vo*, 1:21-cr-509 (TSC); *United States v. Nassif*, 1:21-cr-421 (JDB), ECF Doc. 42; *United States v. John Maron Nassif*, 21-cr-421 (JDB).

scheduled for trial in August 2023.

## Legal Authority

An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)).

### I.     Motion to Dismiss

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the [charging document] for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).

In considering a Rule 12 motion to dismiss, "the Court is bound to accept the facts stated in the indictment as true." *United States v. Syring*, 522 F. Supp. 2d 125, 128 (D.D.C. 2007); *United States v. Sampson*, 371 U.S. 75, 78 (1962). Accordingly, "the Court cannot consider facts beyond the four corners of the indictment." *United States v. Ring*, 628 F. Supp. 2d 195, 204 (D.D.C. 2009) (internal quotations omitted).

### II.     Statutory Interpretation and Vagueness

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites

arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

To determine the legislative intent of a law, courts "always, [ ] begin with the text of the statute." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (internal quotes omitted)). "The search for the meaning of the statute must also include an examination of the statute's context and history." *Hite*, 769 F.3d at 1160 (citing *Bailey v. United States*, 516 U.S. 137, 144-45 (1995)). Importantly, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992).

3

This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)).

The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Argument

## I.      18 U.S.C. §231(a)(3) and (2), Count One, Should be Dismissed

By its plain text, § 231(a)(3) requires that the Government allege four elements. First, that a "civil disorder" existed at the time of the defendant's alleged conduct. Second, that civil disorder "in any way or degree obstruct[ed], delay[ed], or adversely affect[ed] commerce or the movement of any article or commodity in commerce or the conduct and performance of any federally protected function." Third, that one or more "law enforcement officers" were lawfully engaged in the lawful performance of their official duties incident to and during the commission of that civil disorder. And fourth, that the defendant knowingly committed or

4

attempted to commit an act with the specific intent to obstruct, impede, or interfere

with those officers. Id.; see also, e.g., *United States v. Rupert*, Case No. 20-cr-104

(NEB/TNL), 2021 WL 1341632, at *16 (D. Minn. Jan. 6, 2021) (listing elements

based on United States v. Casper, 541 F.2d 1275, 1276 (8th Cir. 1976) (per curiam));

Final Jury Instructions, United States v. Reffitt, Case No. 21-cr-32 (D.D.C. Mar. 7,

2022), ECF No. 119, at 32 (similar articulation of elements in different order).

### A.  Section 231(a)(3) is Unconstitutionally Vague.

"The prohibition of vagueness in criminal statutes 'is a well-recognized

requirement, consonant alike with ordinary notions of fair play and the settled rules

of law,' and a statute that flouts it 'violates the first essential of due process.'"

*Johnson v. United States*, 576 U.S. 591, 595 (2015) (quoting *Connally v. General*

*Constr. Co.*, 269 U.S. 385, 391 (1926)). As the Supreme Court has explained,

> "[i]t is a basic principle of due process that an enactment is void for
> vagueness if its prohibitions are not clearly defined. Vague laws offend
> several important values. First, because we assume that man is free to
> steer between lawful and unlawful conduct, we insist that laws give the
> person of ordinary intelligence a reasonable opportunity to know what is
> prohibited, so that he may act accordingly. Vague laws may trap the
> innocent by not providing fair warning. Second, if arbitraryand
> discriminatory enforcement is to be prevented, laws must provide explicit
> standards for those who apply them. A vague law impermissibly delegates
> basic policy matters to policemen, judges, and juries for resolution on an
> *ad hoc* and subjective basis, with the attendant dangers of arbitrary and
> discriminatory application. Third, but related, where a vague statute
> abuts upon sensitive areas of basic First Amendment freedoms, it operates
> to inhibit the exercise of those freedoms.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (internal citations and

quotations omitted). As mentioned by the Supreme Court in *Grayned*, vagueness

concerns are most acute when the statute imposes criminal penalties and implicates

the First Amendment by chilling exercise of protected expression. *See Kolender v.*

*Lawson*, 461 U.S. 352, 358-59 n. 8 (1983); *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498-99 (1982); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (Where "a statute's literal scope [reaches] expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.").

Section 231(a)(3) is replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. The following examples are illustrative of §231(a)(3)'s vagueness.

### 1.    "Any Act to Obstruct, Impede, or Interfere."

By penalizing "any act to obstruct, impede, or interfere," §231(a)(3) reaches the outer limits of verbal and expressive conduct without drawing *any* distinction that could exclude acts undertaken merely to convey a message or symbolic content. *See Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (acknowledging that "[s]tanding alone . . . a prohibition on 'any act [undertaken] in such a manner as to disturb or alarm the public' fails meaningfully to guide the police and thus poses a substantial risk of arbitrary or discriminatory enforcement.") (quoting *Louisiana v. Cox*, 379 U.S. 536, 551-52 (1965)). The phrase "any act to obstruct, impede, or interfere" can fairly include within its plain meaning such diverse acts as pure speech, expressive conduct, minimal jostling, or even grievous, violent assaults.

### 2.    "Incident to and During the Commission of a Civil Disorder."

The phrasing "incident to and during the commission of a civil disorder" is also problematic for its vagueness. The term "civil disorder," as defined under

6

§232(1), is extremely far-reaching, applying to "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property." 18 U.S.C. § 232(1). This definition of "civil disorder" offers no limitation to solve the vagueness problem because it could apply to virtually any tumultuous public gathering to which police might be called, not just largescale protests or riots. Further, there is no indication within the statute whether the defendant is required to have participated in the civil disorder, or if it is sufficient that he or she be in the general vicinity of the event.

### 3.   Lack of Scienter

The Supreme Court has repeatedly affirmed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests.* at 499. But here, there is no such mitigation, because Section 231(a)(3) contains no scienter requirement, thus creating 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)). Because the statute omits an express *mens rea* requirement, it is left to police, prosecutors, and judges to decide whether the statute requires knowledge or specific intent or neither. The absence of a scienter/*mens rea* element weighs in further favor of the statute's unconstitutionality.

By enacting a statute with such imprecise language, Congress created "a criminal prohibition of alarming breadth." *United States v. Stevens,* 559 U.S. 460, 474 (2010). "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability

to oversee the creation of the laws they are expected to abide." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). Section 231(a)(3)'s scope "may entirely depend" on a law enforcement official's unbounded speculation about subjective factors, *Coates v. Cincinnati,* 402 U.S. 611, 614 (1971), thus subjecting "individuals to the risk of arbitrary or discriminatory prosecution and conviction." *United States v. Kozminski*, 487 U.S. 931, 949-50 (1988) (holding statute unconstitutionally vague where liability "depend[ed] entirely upon the victim's state of mind").

In *Houston v. Hill*, 482 U.S. 451 (1987), the Supreme Court declared unconstitutional a municipal ordinance that made it unlawful to interrupt a police officer in the performance of his or her duties, finding that the ordinance's sweeping nature was neither "inevitable" nor "essential to maintain public order." 482 U.S. at 464. Because the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," it wrongly gave police "unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465. Similarly, here, §231(a)(3) casts far too wide a net. By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, §231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. *C.f. United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."). Moreover, the statute does not weed out those acts with protected expressive content or those that occur in a traditional public forum. Instead, as

8

shall be developed further, *infra*, §231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech and invites discriminatory application by law enforcement and the government.

### B. Section 231(a)(1) Impermissibly Criminalizes Speech Protected by the First Amendment

"In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)). The first Amendment protects expressive conduct like cross-burning, flag-burning and assembly in inconvenient places.[2] Conduct is considered expressive, and therefore protected, under the First Amendment when it "is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (quoting *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999)).

The plain language of §231(a)(3) is at odds with the protections of the First Amendment. Indeed, the broadness of §231(a)(3)'s scope would presumably authorize a felony conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or encourage resistance, or one who

---

2 *Virginia v. Black*, 538 U.S. 343, 365-66 (2003) ("[S]ometimes the cross burning is a statement of ideology, a symbol of group solidarity"); *Texas v. Johnson*, 491 U.S. 397, 405-06 (1989) (flag burning constituted "expressive conduct" protected by the First Amendment); *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984) (assuming that "sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment.").

records police activity with a cell phone. *See Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."); *Glick v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of government officials in public places.").

The First Amendment does not permit an unqualified prohibition on "interference" with police duties because "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-462; *see also McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) (invalidating a state statute for overbreadth that made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties.").

Such broad criminal statutes like §231(a)(3) "must be scrutinized with particular care." *Hill*, 482 U.S. at 459; *see also Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement."). Criminal laws that "make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id.* Section 231(a)(3) extends to a substantial amount of constitutionally protected speech and expressive conduct, well in excess of the law's legitimate sweep.

C. Section 231(a)(3) Cannot be Saved by Construction Without Violating the

   Constitutional Separation of Powers

Judicial interpretation cannot save §231(a)(3) from its constitutional

invalidity. A statute's vagueness does not permit judges to "rewrite a law to confirm

it to constitutional requirements, for doing so would constitute a serious invasion of

the legislative domain, and sharply diminish Congress's incentive to draft a

narrowly tailored law in the first place." *Stevens*, 559 U.S. at 481. Rather, "[w]hen

Congress passes a vague law, the role of the courts under our Constitution is not to

fashion a new, clearer law to take its place, but to treat the law as a nullity and

invite Congress to try again." *Davis*, 139 S. Ct. at 2323.

II.   18 U.S.C. §1752 Fails to State an Offense

   A. The United States Secret Service is the Entity that May Designate "Restricted

      Not the United States Capitol Police

Mr. Gietzen is charged with three counts of violating 18 U.S.C. §1752 for

"entering and remaining in a Restricted Building or Grounds," and engaging in

"disorderly and disruptive conduct in a Restricted Building or Grounds." *See* Doc. 5,

Counts, 5, 6 & 7. Mr. Gietzen is charged with two counts of violating 18 U.S.C.

§1752 for "entering and remaining in a Restricted Building or Grounds," engaging

in "disorderly and disruptive conduct in a Restricted Building or Grounds," and

"Engaging in Physical Violence in a Restricted Building or grounds with a Deadly or

Dangerous Weapon." *See* Doc. 1.  When this statute was enacted, the purpose was

to designate the United States Secret Service ("USSS") to restrict areas for

temporary visits by the President.  *See* S. Rep. No. 91-1252 (1970).  At the time of

enactment, the USSS was part of the Treasury.

Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. §1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." §1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. §3056, which include:

(e)(1) When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

(2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--

(A) what events, if any, were designated special events of national significance for security purposes under paragraph (1); and
(B) the criteria and information used in making each designation.


§3056(e)(1)(2)(A)(B). The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department. The statute makes the exclusive role of the USSS even clearer in §3056(g), which states:

(g) The United States Secret Service shall be maintained as a *distinct*

12

*entity* within the Department of Homeland Security and shall not be merged with any other Department function. *No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

(emphases added).

## B. The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Indictment charges Mr. Gietzen with remaining or entering "restricted building or grounds," however it does not allege that the USSS designated that area as being restricted.  Nor could it do so now because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS.  21-CR-92 (TNM) at Doc. 33.[3]  The court in *Griffen* (as well as other district courts) denied a motion to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas."  *Id.* at Doc. 41.

However, the plain language of 18 U.S.C. §1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."   Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this interpretation.[4]

_____

[3] There have also been many January 6 trials where US Capitol Police officers have testified that they were the entity that restricted the area surrounding the Capitol grounds and not the United States Secret Service.

[4] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of

The court in *Griffen* also hypothesized that the President would be unable to
rely on the military fortification at Camp David already in existence when he visits
that facility if the Secret Service was the only entity with the statutory authority to
restrict the area. *See Griffen* ECF Dkt. No. 41 at pg. 11.  However, Camp David is a
military installation and is not a "public forum" that needs an entity to "cordon off"
areas and restrict them in light of a Presidential visit.  Military bases have security
and are not otherwise open to the public.  And each military installation is subject
to other laws that protect the facility, and those within it, from intruders.  *See, e.g.*,
18 U.S.C §1382 (barring any person from entering any military installation for any
purpose prohibited by law).  Military bases are heavily guarded and have entrance
and exit points and are different than federal buildings that need sections to be
"cordoned" off in order for the general public to know which area is restricted.  For
these reasons, the example offered by the *Griffen* court is inapposite and does not
support the court's decision.

Furthermore, if a deficiency in a statute creates an absurd result or creates
arbitrary enforcement, it should not be enforced until it is amended to provide
clarity and provide fair notice to a defendant.  *Kolender v. Lawson*, 461 U.S. 352,
357 (1983).  The *Griffen* court's reasoning creates a different kind of absurd result –
viz, anyone claiming to be a part of law enforcement could post a sign designating

---

1970.  Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971).  At that
time, the USSS was a part of the Treasury Department.  The Senate Judiciary
Committee report accompanying the current version of §1752 noted that there was
no federal statute that specifically authorized the Secret Service to restrict areas
where the President maintains temporary residences and the senators explained
that the key purpose of the bill was to provide that authority to the Secret Service.
S. Rep. No. 91-1252 (1970).

an area as restricted and a criminal defendant could then be penalized for

trespassing because they "willfully" ignored the sign.

C.  **Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. §1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021**

Under the plain language of 18 U.S.C. §1752, the statute does not apply here.

Section 1752 prohibits conduct in or near "any restricted building or grounds." The

statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned

off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official

residence or its grounds;

(B) of a building or grounds where the President or other person protected

by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event

designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105,

Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts Five, Six and Seven of the Indictment charge Mr. Gietzen with

conduct "in a restricted building and grounds, that is, any posted, cordoned-off and

otherwise restricted area *within the United States Capitol and its grounds, where

the Vice President was temporarily visiting . . ." See* ECF No. 5, (emphasis added).

The Government's attempt to shoehorn Mr. Gietzen's conduct into the statute fails.

15

Accordingly, those three counts should be dismissed.

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1). Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts in the Indictment.

The plain meaning of "temporary" is "lasting for a time only."  Black's Law Dictionary (11th Ed. 2019).  "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021).  Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021.  The Capitol is a federal government building in the District of Columbia, where he lived and worked.  Moreover, he actually worked at the Capitol Building and grounds—it was his place of employment.  In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds."

The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony.  *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

16

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind.* 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with 18 U.S.C. §1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are entirely consistent with the plain meaning of section 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of fulfilling his official duties as Vice President/President of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of 18 U.S.C. §1752.

Lastly, testimony from many January 6 trials have revealed that the Vice President's visit was not the reason for the expanded restricted perimeter but rather it was due to the inaugural stage in construction, COVID-19 restrictions, and

17

the Electoral Vote Event. *See United States v. Gossjankowski*, 21-cr-123 (PLF),

Trial Transcript Volume VI on March 7, 2023, pgs. 1133-34. In *Gossjankowski*,

Secret Service Agent Lanelle Hawa testified that the area around the Capitol

Building was not specifically restricted because the Vice President was going to be

there. *Id.* She also testified that the Vice President does maintain a permanent

office in the Capitol building. *Id.* at 1134. Therefore, the Government's claim that

Mr. Gietzen was inside a restricted area where the Vice President was temporarily

visiting is contradicted by the Government's own evidence that has shown there

were many reasons the area had an expanded perimeter, the temporary visit of the

Vice President not being one of them.

   For the above reasons, Section 1752 does not apply as charged and Counts

Five, Six, and Seven of the Indictment should be dismissed.

## Conclusion

For the foregoing reasons, the Court should dismiss Counts One, Five, Six, and Seven of the Indictment.

Respectfully submitted, June 28, 2023.

Louis C. Allen, III
Federal Public Defender

/s/ Lisa S. Costner
LISA S. COSTNER
Assistant Federal Public Defender
North Carolina State Bar No. 14308
251 N. Main Street, Suite 849
Winston-Salem, NC 27101
(336) 631-5278, Ext. 5172
Email: lisa_costner@fd.org

/s/ Ira Knight
IRA KNIGHT
Assistant Federal Public Defender
North Carolina State Bar No. 43817
301 N. Elm Street, Suite 410
Greensboro, NC 27401
(336) 333-5455
Email: Ira_Knight@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Elizabeth Eriksen
Rebekah Lederer
Assistant United States Attorneys

Respectfully Submitted,

Louis C. Allen, III
Federal Public Defender

/s/ Lisa S. Costner
LISA S. COSTNER
Assistant Federal Public Defender
North Carolina State Bar No. 14308
251 N. Main Street, Suite 849
Winston-Salem, NC 27101
(336) 631-5278, Ext. 5172
Email: lisa_costner@fd.org

/s/ Ira Knight
IRA KNIGHT
Assistant Federal Public Defender
North Carolina State Bar No. 43817
301 N. Elm Street, Suite 410
Greensboro, NC 27401
(336) 333-5455
Email: Ira_Knight@fd.org