## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 22-cr-116-CJN** |
| **v.** | : | |
| | : | |
| **DAVID JOSEPH GIETZEN** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## <u>MOTION TO TRANSFER VENUE</u>

Defendant David Gietzen, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case or, in the alternative, to expand examination of prospective D.C. jurors to include a questionnaire. Gietzen fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]

## <u>BACKGROUND</u>

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol

---

[1] As acknowledge by Defense, every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion. *See United States v. Sara Carpenter,* No. 21-cr-190 (JEB), ECF No. 71 (D.D.C Jan. 31, 2023); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

David Gietzen traveled from North Carolina to Washington, D.C. to attend the 'Stop the Steal' rally.  After the rally, Gietzen joined in the crowd walking towards the United States Capitol Building.  Gietzen entered restricted grounds where he began to clash with United States Capitol Police Department and Metropolitan Police Department officers.  Gietzen was wearing a baseball helmet and bright green jacket.  He wore the helmet while pushing against police line and as he assaulted officers from 2:13 through 2:15PM.  Gietzen again assaulted officers at 2:28PM while wearing the helmet.  At 2:31PM Gietzen assaulted officers with a long metal pole.  Gietzen then positioned himself in the mob of rioters that were pushing and obstructing officers at the Lower West Terrace tunnel from approximately 3:40 to 4:00PM.

Based on his actions on January 6, 2021, Gietzen was charged with Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. § 231(a)(3) and 2; Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b);  Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); and Acts of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

Gietzen now moves for a change of venue.  ECF No. 40.  He mainly contends that prejudice should be presumed in this district based on the results of surveys of potential jurors.  Gietzen further argues the prejudice arises from Washington D.C.'s population characteristics and the pretrial media coverage.  Each of Gietzen's arguments is without merit, and the motion should be denied.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against Gietzen exists in the transferring district that Gietzen cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite

earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

**I.     The Polls Submitted by the Defendant Do Not Support a Presumption of Prejudice.**

Gietzen relies on two polls conducted by at the request of defendants in other cases.  ECF No. 40.  None of these polls supports a change of venue.

Gietzen first relies on a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia.  ECF No. 40 at 4. Select Litigation conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions.  That poll does not support Gietzen's request for a venue transfer.

Gietzen also relies on a poll conducted by In Lux Research ("ILR") at the request of defendants charged in another case. ECF No.40 at 5.  ILR conducted a telephone poll of potential jurors in the District of Columbia and in four other jurisdictions: the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia. That poll does not support Gietzen's request for a venue transfer.

**A.  Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

Gietzen argues that this Court should find a presumption of prejudice based on a poll of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14,

23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private-by-private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent

him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which

prospective jurors have heard about a case and formed an opinion about it.  But that is not the ultimate question when picking a jury.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case."  *Irvin*, 366 U.S. at 722.  Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And Gietzen has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  But, as explained below, the polls submitted by Gietzen do not support a presumption of prejudice in any event.

**B.  The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to Gietzen's contention, the Select Litigation poll does not support a presumption of prejudice in this District.  As an initial matter, the Select Litigation poll selected only one comparator jurisdiction—the Atlanta Division of the Northern District of Georgia.  Gietzen has not requested a transfer to that district or division, but instead asks this Court for a transfer generally.  The Select Litigation survey tells the Court nothing about the views or media exposure of prospective jurors in that district.  The poll therefore cannot show that selecting an impartial

jury would be any more difficult in the District of Columbia than in Gietzen's preferred district. *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C.  The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error.  ECF No. 40, Exhibit 1 at 1-2, 14.  The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta).  *Id.* at 14.  The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta.  *Id.* at 14.  This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

Gietzen points out that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them.  *See* ECF No. 40 quoting Exhibit 1 at 14.  The survey failed, however, to identify (much less define) any of the charges brought against the defendant.  It also failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area.  *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9,  available  at  https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf

("Respondents must be made aware that they can say they do not know or have no opinion.").  The survey instead gave respondents a binary choice between "guilty or not guilty."  ECF No. 40, Exhibit 1 at 14.  Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused."  *Id.*  This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice.  In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here.  *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion."  *Id.* at 178 n.2.  The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know."  *Id.*  Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty."  *Id.*  Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."  ECF No. 40, Exhibit 1 at 14 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty."  Question 5 asked them to

"[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty."  ECF No.40, Exhibit 1 at 14.  In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused."  *Id.* Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

Gietzen points out that, according to the Select Litigation poll, 84% of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the U.S. Capitol on January 6."  ECF No. 40 at 9 (quoting Exhibit 1 at 14).  Although that is higher than the 54% of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6."  *See* CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/ 1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view.  Gietzen has not asked to be tried in Atlanta and has not provided any information about the views in the requested venue.  And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.

Gietzen also points out that 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals."  ECF No. 40 at 9 (quoting Exhibit 1 at 14 (Question 10)).

The answers to this question likely reflect the commonly held view that most people arrested for crimes are in fact guilty of those crimes. But the fact that 62% of D.C. respondents expressed this off-the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of those respondents would be unable to impartially find the facts in a specific case after being properly instructed by the Court. Moreover, the question demonstrates that fully 28% of D.C. respondents would *not* describe those arrestees as criminals, and 9% were unsure or refused to answer. ECF No. 40, Ex. 1 at 14. And the 14% difference between D.C. and Atlanta—which could easily be explained by demographic differences such as age and education levels (*see* ECF No. 40, Ex 1 at 15)—would not justify the conclusion that this is an "extreme case" in which a change of venue is required. *Skilling*, 561 U.S. at 381.

Nor should prejudice be presumed because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%). ECF No. 40, Ex. 1 at 15. For one thing, this question asked specifically about those who "forced their way into the U.S. Capitol," which suggests a higher degree of culpability than simply entering the Capitol. For another, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions. *Id.* Nor did the question define the offenses of "insurrection" or advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no defendant has been charged in connection with January 6. And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of

prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box").  In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C.  *Skilling*, 561 U.S. at 382.

**C.  The In Lux Research poll does not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to Gietzen's contention, the In Lux Research ("ILR") poll does not support a presumption of prejudice in this District.  As an initial matter, Gietzen has not requested transfer to any of the ILR survey's three comparator jurisdictions—the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia.  Instead, Gietzen has requested a transfer to Eastern District of New York.  The ILR survey tells the Court nothing about the views or media exposure of prospective jurors in that district.  The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in Gietzen's preferred district.  *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll demonstrates that that respondents in all four jurisdictions surveyed were aware of the events of January 6 at similar rates.  ECF No. 40, Exhibit 2 at 24 (Question 1) (93.12% of D.C. respondents "aware of" the demonstration at the U.S. Capitol, compared to 94.07% in Middle Florida, 91.60% in Eastern North Carolina, and 94.27% in Eastern Virginia).  The survey also shows that respondents' media or conversational exposure to the events of January 6 did not vary significantly between jurisdictions.  The survey asked respondents how often they "see, read or hear about the events of January 6th from either the Media, Local Leaders

or the people around you." ECF No. 40, Ex. 2 at 21 (Question 4). The percentage of respondents reporting "[a]t least 10 times a week" was only slightly higher in D.C., with a response rate of 32.02%, compared to rates between 25% and 28% in the other three jurisdictions. ECF No. 40, Ex. 2 at 24. And the percentage of D.C. respondents answering "[s]everal times a week" or "[o]nce or twice a week" were generally within one or two percentages points of respondents from other jurisdictions. *Id.* (41.09% of D.C. respondents reported exposure "[s]everal times a week," compared to 39.82%, 39.30%, and 34.58% in the other jurisdictions, and 22.05% of D.C. respondents reporting exposure "[o]nce or twice a week," compared to 20.66%, 22.68%, and 23.99% in the other jurisdictions). The survey thus confirms that exposure to reports of the events of January 6 is not confined to D.C., and the relatively small different does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The ILR survey's summary focuses on responses to "prejudicial prejudgment" questions. ECF No. 40, Ex. 2 at 2. But those questions do not show that an impartial jury cannot be selected in this District. The questions categorized as "prejudgment questions" were:

(1) "Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?" (72% of D.C. respondents answered "Guilty.")

(2) "In your opinion, which of the following terms best characterizes the Events of January 6th? 1) An insurrection, 2) An attack, 3) A riot, 4) A protest that got out of control, 5) A rally." (82% of D.C. respondents chose insurrection, attack, or riot.)

(3) "Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?" (71% of D.C. respondents selected "planned in advance.")

(4) "Do you believe The Events of January 6th were racially motivated?"  (40% of D.C.

respondents answered in the affirmative.)

ECF No. 40, Ex. 2 at 2-3, 8, 21-22.  The last three of these questions do not support a presumption

of prejudice because they have little relevance to the potential issues at trial.  The trial in this case

would not require jurors to determine whether the events of January 6 were an "insurrection," an

"attack," a "riot," or a "protest that got out of control."  Indeed, no defendant has been charged

with the offense of insurrection, 18 U.S.C. § 2383, or of violating the Anti-Riot Act, 18 U.S.C.

§ 2101, in connection with the events of January 6.

Nor would the charges in this case require the jurors to determine whether Gietzen

"planned in advance" to enter the Capitol or whether the crimes were "racially motivated."  The

fact that some D.C. respondents have formed "prejudgments" on those questions does not

demonstrate that they cannot follow this court's instructions and decide this case based on the law

and the evidence.  And even if it did, the solution would be to exclude prospective jurors who

indicated "prejudgments" during voir dire.  The ILR survey shows that some percentage of

respondents in *all* surveyed jurisdictions expressed these so-called "prejudgments."  ECF No. 40,

Ex. 2 at 25 (Questions 6 and 9) (between 39% and 49% of respondents in other surveyed

jurisdictions thought entry into the Capitol was planned in advance, and between 11% and 20%

believed the events of January 6 were racially motivated).  This demonstrates that a careful voir

dire would be necessary in any jurisdiction, and it fails to show that voir dire would be inadequate

to weed out biased jurors in the District of Columbia.

Nor do the responses to the first "prejudicial prejudgment" question support a presumption

of prejudice.  That question asked respondents whether, in the abstract, they were "more likely" to

find a defendant charged in connection with January 6 "guilty or not guilty."  The question failed

to ask about any specific crimes.  And it failed to ask respondents whether they could keep an open mind and decide a case based on the law and the evidence if selected as a juror.  Yet the Supreme Court has made clear that the key question in jury selection is whether a prospective juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23.

When focusing on whether prospective jurors could set aside their "prejudgments" and decide a case fairly, the ILR survey's responses actually undermine Gietzen's claim that prejudice should be presumed in this district.  When asked whether it would be "possible for [them] to be a fair and unbiased juror for a January 6th Defendant," ECF No. 40, Ex. 2 at 23, a full 70.13% of D.C. respondents said that they "could," *id.* at 26.  This number was actually *higher* than the affirmative responses in the other three jurisdictions: Middle Florida (61.29%), Eastern North Carolina (65.38%), and Eastern Virginia (69.52%).  *Id.*

The ILR survey's administrator asserts that "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality."  ECF No. 40, Ex. 2 at 5.  But the survey's findings do not justify that assertion.   The administrator claims that because D.C. residents were more likely to characterize the events of January 6 as an "insurrection," "attack," or "riot," or to believe they were criminal, pre-planned, or racially motivated, *id.* at 22, 25, those residents "demonstrate[d] an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror," *id.* at 5.  But this assumes, contrary to clear decisions from the Supreme Court, that any knowledge of or preconceived opinions about a case make a juror unable to be impartial.  *See Reynolds*, 98 U.S. at 155-56; *Irvin*, 366 U.S. at 723. It also assumes that these jurors would fail to report these views to a judge during voir dire. Particularly because the ILR survey had already asked respondents specific questions that the

survey claims showed "prejudicial prejudgment," there is no reason to believe that D.C. respondents were somehow unable or "unwilling[]" to report their own biases when asked if they could be impartial.

Moreover, when asked if their "neighbors would be fair and unbiased jurors for a January 6th Defendant," D.C. respondents still answered "Yes" at a higher rate than the other surveyed districts.  ECF No. 40, Ex. 2 at 26 (53.25% in D.C., compared to 36.57% in Middle Florida, 45.10% in Eastern North Carolina, and 40.89% in Eastern Virginia).  Thus, even when controlling for respondents' potential inability to discern their own biases, the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions.  Nor were D.C. respondents significantly more likely to worry about negative consequences to their career or friendships if they were to "find[] a January 6th defendant Not Guilty."  *Id.* at 22, 26 (19.29% in D.C., compared to 17.68% in Middle Florida, 19.66% in Eastern North Carolina, and 18.56% in Eastern Virginia).  The ILR survey does not support the conclusion that an impartial jury cannot be found in Washington, D.C.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required.  *Haldeman*, 559 F.2d at 62.

## II.  The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.

Gietzen also contends that a D.C. jury cannot be impartial because of various

characteristics of the District's jury pool: the political makeup of the District's electorate, the

impact of January 6 on D.C. residents, and the prevalence of federal employees in the District.

ECF No. 40 at 11-12 and 20.  None of these claims has merit.

### A.  The District of Columbia's political makeup does not support a change of venue.

Gietzen contends that he cannot obtain a fair trial in the District of Columbia because more

than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential Election.

ECF No. 40 at 9 AND 20.   The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*,

where the dissent concluded that a venue change was required because "Washington, D.C. is

unique in its overwhelming concentration of supporters of the Democratic Party" and the

Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968

and 1972, respectively.   *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and

dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited

by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."

*Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting

the argument that "because of [the defendant's] connection with the Nixon administration and his

participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial

overtones, a truly fair and impartial jury could not have been drawn from the District's heavily

black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not

"at all pertinent to venue" in a case involving high-ranking members of a presidential

administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be

sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with a defendant's political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020); *United States v. Bannon*, No. 210-cr-670 (CJN). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not

impartially consider the evidence against those charged in connection with the events on January 6.

### B. The impact of January 6 on Washington D.C. does not support a change of venue.

Gietzen contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.  (ECF No. 40 at 14).  But January 6 is now nearly two plus years in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001, attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

**C. The number of federal employees who reside in the District of Columbia does not support a change of venue.**

Gietzen argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members.  (ECF No. 40 at 12).  But Gietzen does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror.  Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly impacted.  Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture of many federal agencies at the time.  And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote.  There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case.  *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government.  According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017.  OPM, Federal Civilian Employment, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.  But many federal employees who work in the District live outside the District and would not be part of the jury pool.  And the District has nearly 700,000 residents.  Thus, even if every federal employee were

disqualified, the Court would be able to pick a jury in this District.

III.   **The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

Gietzen also contends that prejudice should be presumed based on pretrial publicity.  ECF No. 40 at 16.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau* (the case heavily relied upon by Gietzen), the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—

at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they

contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A. Size and characteristics of the community

Gietzen suggests that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

**B. Nature of the pretrial publicity**

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Gietzen is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* Indeed, although any media characterizations of Gietzen would be inadmissible, the photos and videos of Gietzen that have been disseminated would be both admissible and highly relevant at trial. *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Gietzen also argues that prejudice should be presumed based on portrayal of January 6 by the government and media "as an attempt to overthrow the Government." ECF No. 40 at 11. But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice. In *Skilling*, the news stories about defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected

to shut from sight." *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*  The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Gietzen.  And, again, statements by United States Senators, NFL football coaches, and even the District of Columbia Mayor are reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

Gietzen asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a tiny percentage of the news coverage of January 6 has focused on Gietzen.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 1,000 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where

much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.  As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. (33%) and Atlanta (30%).  See Exhibit 1, attached to Def. Motion, ECF No. 40.  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### C.  Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, 24 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, an extremely small number of stories have mentioned Gietzen, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.  The jury verdict

Because Gietzen has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance,"

*id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports  Gietzen's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

Gietzen suggests that this factor actually *supports* his claim of prejudice because the other jury trials involving January 6 defendants have resulted highly publicized pleas and (until recently mostly unanimous) guilty verdicts.  ECF No. 40 at 21.  But although the *Skilling* indicated that a split verdict could "undermine" a presumption of prejudice, it never suggested that a unanimous verdict—particularly a unanimous verdict in a separate case involving a different defendant—was enough to establish prejudice.  The prompt and unanimous guilty verdicts in other January 6 jury trials resulted from the strength of the government's evidence.  Moreover, juries in recent January 6 trials have either been unable to reach a verdict on certain counts, *see United States v. Gillespie,* No. 22-cr-60 (D.D.C. Dec. 2022), *United States v. Williams*, No. 21-cr-618 (D.D.C.), or have acquitted on some counts, *see United States v. Wren,* No. 21-cr-599 (D.D.C Apr. 2023), *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2022).  This indicates that D.C. jurors are carefully weighing the evidence and not reflexively convicting January 6 defendants on all charges.  And, as explained below, the jury selection in those cases indicates that impartial juries can be selected in this district.

## IV.    A Jury Questionnaire Is Not Necessary in This Case.

Gietzen also requests that this Court use a jury questionnaire in selecting a jury.  ECF No. 40 at 22. Gietzen request should be denied.  Although this Court has discretion to use a written questionnaire, it need not do so because it can select an impartial jury using only in-person voir

dire.[2]  Issues of pre-trial publicity and potential prejudice are more meaningfully explored by in-person examination than by use of a jury questionnaire.  "[W]ritten answers [do] not give counsel or the court any exposure to the demeanor of the juror in answering the . . . questions."  *Mu'Min*, 500 U.S. at 425.  A prospective juror's tone of voice and demeanor are important.  *See Rosales-Lopez*, 451 U.S. at 188 (observing that the court "must reach conclusions" based on its "own evaluation[] of demeanor evidence and of response to questions").  Indeed, "[h]ow a person says something can be as telling as what a person says."  *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994); *see also Mu'Min*, 500 U.S. at 433 (O'Connor, J., concurring) ("A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused.").  And even where a questionnaire is used, in-person follow-up questioning is important to give the court the "face-to-face opportunity to gauge demeanor and credibility."  *Skilling*, 561 U.S. at 395.  A jury questionnaire would not materially assist jury selection in this case, since there is no suggestion that this particular defendant has received significant, unfavorable pretrial publicity, and any potential prejudice due to general media coverage of the events of January 6, 2021, can be adequately probed through in-person voir dire examination.

---

[2] Some judges in this District have used written questionnaires to aid in screening potential jurors in particular cases. *See, e.g., United States v. Stone*, --- F. Supp. 3d ---, 2020 WL 1892360, at *2-3 (D.D.C. Apr. 16, 2020); *United States v. Lorenzana-Cordon*, No. 03-CR-331, 2016 WL 11664054, at *1 (D.D.C. Feb. 22, 2016).  The practice is not common in this District and one judge has granted a request to use a questionnaire in a January 6 trial.  *United States v. Alford*, 21-cr-263, ECF No. 46 at 15 (D.D.C. Apr. 18, 2022) (TSC).  Of note, Judge Chutkan later expressed "I really regret allowing this questionnaire. We've had far more high-profile cases, even January 6 cases, tried . . . without a questionnaire, and almost everything in this questionnaire would have been elicited in vior dire." *Alford*, Tr. Tran. at 7 (Sept. 28, 2022).

V.   **The Voir Dire Process in the First January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.**

At this point, dozens of other January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over each of those trials was able to select a jury in one or two days.  *See United States v. Reffitt*, 21-cr-32, Minute Entries (D.D.C. Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34-CRC, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (D.D.C. May 23, 2022).  And although the government does not yet have transcripts from the *Thompson* or *Hale-Cusanelli* trials, the voir dire in the other three cases undermines Gietzen's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt* Trial Tr. 521.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt* Trial Tr. 23, 30.  The Court then followed up during individual voir dire and qualified ten prospective jurors who had answered one or more of those bias questions affirmatively but who clarified during individual questioning

that they could decide the case fairly and impartially.[3]  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[4]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined).  *See Robertson* Trial Tr. 302.  The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict."  *Id.* at 14.  It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial."  *Id.* at 13, 15.  As in *Reffitt*, the Court followed up on affirmative answers to those questions during individual voir dire, and of the 12 prospective jurors who raised potential concerns about their partiality during voir dire, the Court qualified two who indicated that they could, in fact, be impartial, and struck one for a different reason.[5]  Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that

---

[3] *Reffitt* Trial Tr. 60-61 (Juror 1541); 87-88 (Juror 1332); 104-06 (Juror 457); 162-65 (Juror 1486); 188, 191-94, 201 (Juror 1675); 289-90, 297-98 (Juror 365); 301-03, 307-09 (Juror 38); 326-33 (Juror 1655), 427-31 (Juror 344), 436-40 (Juror 1221).

[4] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484).  For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[5] *Robertson* Trial Tr. 23-26 (Juror 1566, struck based on hardship), 64-73 (Juror 254, qualified); 130-36 (Juror 1219, qualified).

they had such strong feelings about the January 6 events that they could not be fair or impartial.[6]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 AM Tr. 6, though it later excused one of those 35 based on hardship, *Webster* 4-25-22 PM Tr. 217-18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster* 4-25-22 AM Tr. 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66. The presiding judge observed that the Court was able to "qualify 35 jurors after questioning 53 of them" and recalled that only "about 50 percent" of those stricken for cause were stricken based on "either connections to the events or because they expressed an inability to be fair and impartial." *Webster,* 4-26-22 AM Tr. 7. The transcripts confirm that only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[7] The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at

---

[6] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160). For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

[7] Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster* 4-25-22 AM Tr. 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster* 4-25-22 PM Tr. 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262). Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster* 4-25-22 AM Tr. at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster* 4-25-22 PM Tr. at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

root in the venue transfer motion" in that case.  *Id.*

In these first few trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice."  *Irvin*, 366 U.S. at 728.  In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner."  *Id.* at 727.  The percentage of partiality-based strikes in these January 6-related trials— between 16% and 19% of those examined—is far lower than the 62% in *Irvin*.  The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt."  *Murphy*, 421 U.S. at 803.  *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."  *Id.*  As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first few January 6-related trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny Gietzen's request for a venue transfer and should instead rely on a thorough voir dire to protect Gietzen's right to an impartial jury.

32

## **CONCLUSION**

For the foregoing reasons, Gietzen's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Elizabether Eikerson*
Elizabeth N. Eriksen
VA Bar No. 72399
Trial Attorney, Detailee
1301 New York Avenue, N.W., 8th Floor
Washington, DC 20530
(202) 616-4385
Elizabeth.Eriksen@usdoj.gov


*/s/ Rebekah E. Lederer*
REBEKAH E. LEDERER
Assistant United States Attorney
Bar No. PA 320922
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-7012
Rebekah.Lederer@usdoj.gov